Rockingham
No. 87-253

# THE STATE OF NEW HAMPSHIRE

## v.

## RICHARD A. GLAUDE

December 12, 1988

*Stephen E. Merrill,* attorney general (*William H. Lyons,* assistant attorney general, on the brief and orally), for the State.

*James E. Duggan,* appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J. The defendant, Richard A. Glaude, appeals his conviction for driving after having been certified as an habitual offender pursuant to RSA 259:39 (Supp. 1988). He was sentenced to serve one to five years in the State prison, subject to conditions not here in question. The defendant asserts that: (1) the arresting officer's initial stop of his vehicle was impermissible under both State and Federal Constitutions; and (2) the questioning of him by a police officer after his vehicle had been stopped exceeded the scope of allowable questioning under the circumstances. The defendant raised these issues before the Superior Court (*Gray,* J.), who denied his accompanying motion to suppress evidence. He was convicted on the basis of stipulated facts in a trial to the Court (*McHugh,* J.). We affirm.

The facts may be briefly summarized as follows. State Trooper Michael Hambrook was assisting the Hampton police in traffic control on the evening of July 27, 1986. The trooper was stationed on foot between the two northbound lanes of Route 1A, the main street of Hampton Beach, where the vehicles were bumper to bumper and moving very slowly.

Trooper Hambrook observed the defendant's vehicle as it passed, and saw within the vehicle an open Budweiser beer can and a cooler, both of which were located on the rear floor of the automobile on the passenger side. He motioned for the defendant to pull over to the side of the highway because, as he testified, "Hampton has a town ordinance against open containers. . . ." He then approached the defendant, who was the driver.

Trooper Hambrook asked the driver for his license and registration. The defendant then spontaneously responded, according to the trooper's testimony, that "he didn't have a license" and further that "he was in trouble and he had been an habitual offender." The trooper confirmed the defendant's statement by radio and placed

him under arrest for the felony offense of driving while certified as an habitual offender; he did not further investigate the so-called "open container" violation.

Hampton has a local ordinance which reads as follows:

"Sec. 3:701 *Alcohol Prohibited*

No person shall consume any liquor or beverage or possess any opened container thereof, as defined by RSA 175:1, while in any vehicle upon a public highway, or while upon any public highway, sidewalk or common within the limits of the Town of Hampton."

At the hearing on the motion to suppress, Trooper Hambrook testified that there were two passengers in the defendant's automobile, but that he was uncertain whether only one or both were in the rear seat. He further testified that the cooler was also in the rear of the automobile. He could not recall whether the beer can was standing upright or on its side, and none of the occupants was observed consuming any alcoholic beverage. However, he was certain as to the fact that he had observed an open beer can and a cooler in the rear of the automobile before requesting the vehicle to pull over for an investigative stop.

 The defendant argues that the initial stop by Trooper Hambrook violates both the State and Federal Constitutions. Our case law requires that we first examine this claim under the State Constitution, relying on federal case law only for guidance. *State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983). Since State and federal constitutional law with regard to investigative stops are identical, *State v. Parker*, 127 N.H. 525, 529, 503 A.2d 809, 811 (1985), we need not make any separate federal analysis as to this issue. In *State v. Brodeur*, 126 N.H. 411, 493 A.2d 1134 (1985), we adopted the rule first enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968). This rule permits police temporarily to detain a suspect for investigatory purposes, even though the grounds for the stop do not amount to probable cause justifying arrest of the suspect for the commission of a crime. However, the police must have an articulable suspicion that the person detained has committed or is about to commit a crime. *State v. Brodeur, supra* at 415, 493 A.2d at 1137–38; *see also State v. Maya*, 126 N.H. 590, 595, 493 A.2d 1139, 1143 (1985). In justifying the stop, "'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Brodeur supra* (quoting *Terry v. Ohio, supra* at 21).

Therefore, in assessing the defendant's claim, we must consider the sufficiency of Trooper Hambrook's articulable suspicion, the scope of his inquiry, and the length of the stop. *State v. Maya supra.* This inquiry is mandated because "[t]he scope of the detention must be carefully tailored to its underlying justification . . . [and] must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500 (1983).

An important element to be considered in determining the sufficiency of the officer's articulable suspicion is the "'nature and quality of the intrusion on personal security' [which] must be balanced against 'the importance of the governmental interest alleged to justify the intrusion.'" *State v. Parker, supra* at 530, 503 A.2d at 812 (quoting *United States v. Hensley,* 469 U.S. 221, 228 (1985)). Trooper Hambrook testified that he was assisting the Hampton police because the town was having a "lot of problems in the Hampton Beach area that particular summer." He further testified that he was working an overtime detail because the "local police were outnumbered, in sheer numbers, we were there to back them up." The police, according to Hambrook, were attempting, by foot patrols, to stop rowdiness, traffic violations, and DWI violations, "as well as fatalities." The legitimate public concern in this situation was clear. *Cf. State v. Parker,* 127 N.H. at 530, 503 A.2d at 812. The circumstances called for active police scrutiny of suspected violations of the law. *Cf. id.* at 530–31, 503 A.2d at 812.

Trooper Hambrook observed an open beer can and a cooler in the defendant's vehicle. These two facts, in combination with the circumstances of this case as set forth above in detail, would cause a man of reasonable caution and prudence to be on guard to insure that the Hampton ordinance was being obeyed. We therefore hold that Trooper Hambrook acted reasonably in making an investigatory stop, given the totality of the circumstances present here. Under the facts of this case, common sense dictated that the trooper take reasonable steps to investigate, and an investigatory stop to determine whether the Hampton ordinance had been violated was thus reasonable.

The defendant next contends that, even if the stop was lawful, the scope of the questioning of the defendant was unlawful because it was not tailored to the reason for the seizure; *i.e.,* a suspected violation of the open container ordinance. *See State v. Maya,* 126 N.H. at 595, 493 A.2d at 1143–44. The defendant would have this court rule that the trooper could not inquire as to the driver's name

and vehicle registration until he was satisfied that there was a violation of the Hampton ordinance.

There are few, if any, standard operating procedures which nearly every police officer employs more routinely than that of requesting the driver's name and vehicle registration when first addressing a driver stopped for operating a vehicle that may be involved in illegal activity. This is true whether it be a stop sign violation or operating the vehicle so as to endanger the lives of other drivers, passengers, or pedestrians. In *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984), the United States Supreme Court recognized that an officer may ask "the detainee a moderate number of questions to determine his *identity* and to try to obtain information confirming or dispelling the officer's suspicions." (Emphasis added.) Trooper Hambrook did nothing more than what was the routine and prudent first step in any investigative stop. *See State v. Parker*, 127 N.H. at 531, 503 A.2d at 812–13. That the trooper's question prompted the wholly unexpected confession of a serious crime by the defendant does not make the usual and prudent inquiry unlawful.

The defendant claims that any inquiry should have been directed toward the passenger or passengers in the rear, where the can and cooler were located, rather than the driver. This argument totally ignores the fact that at the time of the stop the driver was as likely as either of his passengers to have violated the town ordinance and thus was an appropriate subject for the minimal questioning that took place. While further investigation might have shown the driver to be unaware of any violation, or that no violation had occurred, there was certainly a reasonable suspicion that the driver was aware of what was going on in his vehicle. That being the case, the officer acted reasonably in seeking to learn the identity of the driver.

Under *State v. Maya*, 126 N.H. at 596, 493 A.2d at 1144, the final prong to be considered is the length of the stop. Here the defendant does not contest the length of the stop, however, and hence we need not consider this issue.

We therefore find that the defendant's State and federal constitutional rights were not violated by the investigatory stop that resulted in his arrest.

The officer's failure to pursue the open container violation, after having been voluntarily informed of the more serious offense of driving after being found to be an habitual offender, was entirely reasonable and within the sound discretion of the arresting officer.

We hold that the defendant's motion to suppress was properly denied and affirm his conviction.

*Affirmed.*

BATCHELDER, J., with whom BROCK, C.J., joined, dissented; the others concurred.

BATCHELDER, J., dissenting: On the day in question, Trooper Hambrook stopped a vehicle operated by the defendant with two passengers in the back seat. In addition to the back-seat occupants, there was a cooler, so-called, and a beer can on the floor in back, behind the front passenger seat. The car was in bumper-to-bumper traffic. There was no evidence of impaired or otherwise remarkable operation of the vehicle. There was no rowdiness, nor objectionable conduct attributable to the car's occupants. The vehicle apparently showed no mechanical or operational malfunctions which would be suggestive of defective equipment. Because the record in this case is barren of factual underpinning for the officer's conduct, we do not know whether the beer can was in the distinct or exclusive zone of control of any particular individual. We do not know whether it was in an upright position or flat on its side rolling about the floor. It was not in the hand of any occupant. We do not know whether it was full, or half full of beer, or whether it was empty or had been empty for hours, days, or weeks. We know nothing about the cooler or its contents, if any, other than its presence in the car. What this case is all about is not whether the defendant was an habitual offender but whether there was evidence supporting an articulable suspicion that the Hampton open-container ordinance was being violated in some way by someone in the vehicle. After the defendant stopped his vehicle, the officer did not examine the beer can, nor did he question any occupant concerning it. It is not an offense to possess an empty beer can. In this case there were no furtive gestures by any occupant in the vehicle with respect to the beer can, nor any movement calculated to hide or conceal it, observed by the officer.

In all cases such as this the State has the burden to prove the legality of the stop. *State v. Maya*, 126 N.H. 590, 595, 493 A.2d 1139, 1143 (1985). A few more questions by the prosecutor directed to Trooper Hambrook might well have flushed out the record to support the trooper's conduct. However, the record is devoid of even the most commonsense prosecutorial inquiries or follow up. The fact that bigger game was felled than originally hunted does not alter the threshold level of articulable facts required to justify the stop.

Once the stop (seizure) has occurred, article 19 and fourth amendment rights become implicated.

As was once so aptly stated by Justice Frankfurter,

> "The old saw that hard cases make bad law has its basis in experience. But petty cases are even more calculated to make bad law. The impact of a sordid little case is apt to obscure the implications of the generalization to which the case gives rise. Only thus can I account for a disregard of the history embedded in the Fourth Amendment and the great place which belongs to that Amendment in the body of our liberties as recognized and applied by unanimous decisions over a long stretch of the Court's history.
>
> . . . .
>
> It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment.
>
> . . . .
>
> These words are not just a literary composition. They are not to be read by a man who knows English but has no knowledge of the history that gave rise to the words. The clue to the meaning and scope of the Fourth Amendment is John Adams' characterization of Otis' argument against search by the police that 'American independence was then and there born.'"

*United States v. Rabinowitz*, 339 U.S. 56, 68–69 (1950) (Frankfurter, J., dissenting), *overruled by Chimel v. California*, 395 U.S. 752, 768 (1969).

The facts in this case do not meet the investigative stop, articulable suspicion standard applied by this court. *See State v. Brodeur*, 126 N.H. 411, 411–16, 493 A.2d 1134, 1137–38 (1985); *State v. Maya, supra* at 595, 493 A.2d at 1143; *State v. Parker*, 127 N.H. 525, 530, 503 A.2d 809, 812 (1985). In *Brodeur*, we found that a police officer's observation that the defendant driver was committing a traffic violation constituted specific articulable facts which justified an investigative stop. In *Maya*, where a police officer observed a young man sweaty, breathing hard, nervous, given to glancing in the direction of a recently burglarized store, cut, and bleeding on a deserted street near the scene of a recently committed burglary involving broken glass, and where there was

a police chase on foot of the suspect into the woods, we found "specific articulable facts" sufficient for an investigative stop. Lastly, in *Parker* we found that when an officer saw a child's head duck up and down in a camper parked with its lights off in a darkened parking lot with the defendant, who had previously told officers that he was traveling alone, these observations combined to form an articulable suspicion that the child was in danger. *State v. Parker*, 127 N.H. at 530, 503 A.2d at 812. None of the factors present in these cases is established in the record before us; thus, on the facts, the State failed to prove the legality of the stop and should not have been permitted to use evidence obtained in that stop at trial.

BROCK, C.J., joins in the dissent.